IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VINCENTE SOLOMON,

    Plaintiff,                    No. CIV S-10-2103 WBS GGH P

    vs.

J. NEGRETE, et al.,               ORDER and

    Defendants.             FINDINGS AND RECOMMENDATIONS

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983. By order, filed on October 18, 2011, service of process was directed upon the defendants. Prior to this order, on September 8, 2011 (docket # 41), plaintiff brought a motion for a court order to renew his pain medications. By order, filed on September 19, 2011 (docket # 43), this court directed defendant Dr. Tate to file a response to the motion. Dr. Tate's response, in the form of a declaration was filed on October 5, 2011 (docket # 48); defendant Tate having made an appearance in this case, no further service of process was required for him to be deemed served.[1]

\\\\

---

[1] Nevertheless, defendant Tate will not be required to respond to the amended complaint before the remaining defendants to be served will be required to respond.

1

1       Plaintiff has repeatedly sought an "emergency transfer," and motions for various
2  other forms of preliminary injunctive relief.  See filings dated, April 25, 2011 (docket # 20),
3  May 12, 2011 (docket # 22), June 3, 2011 (docket # 24), June 21, 2011 (docket # 28), June 27,
4  2011 (docket # 31).  These insufficiently supported and duplicative, as well as largely premature,
5  motions have been either vacated or denied.  See, e.g., Orders, filed on May 3, 2011 (docket #
6  21), May 20, 2011 (docket # 23), June 24, 2011 (docket # 30), July 21, 2011 (docket # 35).  By
7  order filed on June 24, 2011, the undersigned ordered plaintiff not to continue to engage in
8  seriatim filings "of inadequately supported and inapposite requests for preliminary injunctive
9  relief, particularly while such a request is still pending...."  Plaintiff was cautioned that should he
10 continue to do so, the court would disregard such filings.  Id.  Notwithstanding, before the court
11 had ruled on the September 8, 2011, motion plaintiff filed two more, one on September 26, 2011,
12 and another on October 5, 2011, both seeking a court-ordered transfer.  These motions will be
13 disregarded.  Plaintiff is also cautioned that the seriatim filings, particularly those made in
14 disregard of court orders, may be construed as an abuse of process.

Plaintiff's Underlying Allegations

16      Plaintiff, who was at the E.O.P. (Enhanced Outpatient) level of care, alleges that,
17 on November 16, 2009, defendant Dr. Tate wrote him up, cutting plaintiff off his chronic pain
18 medication as a form of punishment for plaintiff's having asked for help and for renewal of his
19 medication.[2]  First Amended Complaint (FAC), p. 70.  Plaintiff states that he (plaintiff) had been
20 approved by both the medical review board and health care manager board.  Id.  Plaintiff claims
21 that defendant Tate told him there was nothing wrong with him medically; plaintiff references x-
22 rays and therapy received at Tehachapi Hospital and MRI reports at Salinas Valley State Prison
23 (SVSP) and at Californian Correctional Institution (CCI) on November 30, 2009 and December
24 30, 2009.  Id.  Plaintiff alleges that defendant Tate was deliberately indifferent to his pain and the

---

[2] Here the court sets forth only those claims of the first amended complaint relevant to plaintiff's present motion for a preliminary injunction.

2

suffering caused by Tate's suddenly cutting him off a powerful narcotic and that such medication is intended to be decreased gradually and not cut off abruptly. Id. Plaintiff claims that a mental health patient is never to be cut off medication prescribed for physical needs without first obtaining permission from his health manager. Id. Plaintiff claims defendant Tate's action was taken with malice and with a deliberate intent to hurt plaintiff or to force him to kill himself. Id. As relief, plaintiff asks for money damages, including punitives. Id., at 3. Although he does not expressly seek prospective injunctive relief, the undersigned will liberally deem his incomplete request " and whatever relief this court..." as a request for whatever other relief the court deems appropriate and will find that his claims for relief encompass a claim for prospective injunctive relief. Id.

Motion for Preliminary Injunctive Relief

*Legal Standard*

"The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009), quoting Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S. Ct. 365, 374 (2008).

A Ninth Circuit panel has found that post-Winter, this circuit's sliding scale approach or "serious questions" test survives "when applied as part of the four-element *Winter* test." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-1132 (9th Cir. 2011). "In other words, 'serious questions going to the merits,' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." Id., at 1132.

In cases brought by prisoners involving conditions of confinement, any preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the

harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2).

*Legal Standard for Eighth Amendment Claim*

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

> A prison official acts with "deliberate indifference ... only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1187 (9th Cir.2002) (citation and internal quotation marks omitted).  Under this standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but that person "must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." Gibson, 290 F.3d at 1188 (citation omitted). FN4 This "subjective approach" focuses only "on what a defendant's mental attitude actually was." Farmer, 511 U.S. at 839, 114 S.Ct. 1970. "Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." McGuckin, 974 F.2d at 1059 (alteration and citation omitted).
>
>> FN4. In a recent case, we recognized that "deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." Lolli v. County of Orange, 351 F.3d 410, 421 (9th Cir.2003) (citations omitted); see also Gibson, 290 F.3d at 1197 (acknowledging that a plaintiff may demonstrate that officers "must have known" of a risk of harm by showing the obvious and extreme nature of a detainee's abnormal behavior). []

Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004).

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

5

1       Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. <u>Shapley v. Nevada Bd. of State Prison Com'rs</u>, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. <u>McGuckin</u>, 974 F.2d at 1060, citing <u>Wood v. Housewright</u>, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and <u>Hudson</u>, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry. <u>McGuckin</u>, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." <u>McGuckin</u>, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference. <u>Hutchinson v. United States</u>, 838 F.2d 390 (9th Cir. 1988). The dispositive question is ultimately <u>not</u> what was the most appropriate course of treatment for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence, criminally reckless.

*Plaintiff's Motion*

Plaintiff's most fundamental obstacle to obtaining preliminary injunctive relief is that he does not provide adequate expert evidence to support his motion. Plaintiff seeks renewal of his pain medications: morphine and Gabapentin[3], claiming that defendant Tate cut him off the medications for no reason. Motion, p. 1. Plaintiff also contends that defendant Tate asked plaintiff if he (plaintiff) was suing him and, when plaintiff said he was, states that defendant Tate

---

[3] Gabapentin is primarily an anti-convulsant medication, but it does have pain therapy uses as well. As with all powerful medications, there are known, possible side effects including strange or unusual thoughts (including suicide), anger, anxiety, and aggressive thinking. <u>See</u> www.nim.nih.gov/medlines/druginfo/meds/a694007.html.

6

then told him he saw no reason to continue to waste taxpayer money for the expensive medication. Id. According to plaintiff, defendant Tate stated that he would need a court order for the medications to be approved. Id. Plaintiff reiterates the allegations of the amended complaint regarding defendant Tate's having cut plaintiff off his medications in November of 2009 for the purpose of causing him pain and suffering. Id. Plaintiff references defendant Tate's having ordered x-rays and MRI's from November 30, 2009 to December 30, 2009 and on January 10, 2010; plaintiff avers that since that time he was ordered on the medications, by which he presumably means, he was ordered back on the same medications that defendant Tate had eliminated and that defendant Tate was supposedly disciplined for cutting him off. Id., at 3. Plaintiff claims that he will be in such pain for the rest of his life, arising from a beating he sustained from correctional officers at High Desert State Prison on August 3, 2007, that he would need to be on pills for the rest of his life; plaintiff claims that a spinal limb specialist so informed him. Id. Plaintiff alleges that defendant Tate has once again cut plaintiff off his meds, that he is also the appeals coordinator and that the Chief Medical Officers, Joaquin and Sheisha, as well as a Ms. Ledford, are refusing to help. Id. Plaintiff claims his medical grievances keep getting screened out, he never gets seen by a doctor and that none of his medications have been renewed. Id. Plaintiff claims that he has fallen more than fifty times, but it is unclear what relationship this has to his claimed need for pain medication.[4] Id. Plaintiff asks that his morphine and Gabapentin prescriptions be renewed for three times daily. Id. Plaintiff includes a number of copies of medical reports,[5] some partial, none authenticated, as well as copies of grievances.

\\\\

---

[4] Unsteadiness is a known side effect of Gabapentin. See citation in footnote 3. A demonstration of this side effect would be one reason for not perpetually prescribing this drug.

[5] While reference is therein made to plaintiff's injuries arising from a gunshot wound in 1992; no reference is made to a beating in 2007 that plaintiff mentions. See, e.g., Motion, p. 11. Among the documents included in the response, confusingly, reference is made to a gunshot to plaintiff occurring around 2007. See following.

*Defendant Tate's Response*

Defendant Tate declares that he is a CDCR staff physician and surgeon at CCI, whose job it is to provide inmates' primary medical care, including conducting physical examinations, providing necessary treatment, prescribing medication, interpreting test results and providing preventative information. Declaration of H. Tate, M.D., ¶¶ 2-3. Defendant Tate states he could not conduct a thorough review of plaintiff's eight-volume medical record in the time allotted for a response, but has included, as Exhibit A, the records he has generated or signed in treating plaintiff since November 2009, and as Exhibit B, plaintiff's relevant medical records, including the authentication of those records by CDCR's custodian of records. Id., at ¶ 5.

Defendant Tate states that he first saw plaintiff on November 8, 2009, plaintiff having submitted a (CDC 7362) request for medical services stating that he had a medical emergency. Tate Dec., ¶ 6. Plaintiff indicated in the request, per Dr. Tate, that plaintiff's inmate appeal regarding the renewal of his medication had already been granted; plaintiff asked that his prescriptions for Oramorph (morphine sulfate used to relieve pain) and Gabapentin (for relief of neuropathic pain), which were not due to expire until November 11, 2009, and April 11, 2010, respectively, be renewed. Id., Exhibit (Ex.) A, 1-3 [court docket # 47-1, 2-4]. Defendant Tate did not consider plaintiff's request to be an emergency, but nevertheless examined him, noting that plaintiff "was muscular with a powerful build." Tate Dec., ¶ 7. Plaintiff told Dr. Tate that he was taking the Oramorph and Gabapentin for a two-year-old gunshot wound and for problems he did not specify with his shoulders, hip and low back. Id. According to defendant Tate, plaintiff "did not state that he was in pain," although the doctor "noted he had tenderness of the biceps." Id. The doctor's review of several imaging studies of his lumbar spine and pelvis made earlier in the year "showed some minor degenerative or arthritic changes," but "no abnormalities, fractures, dislocations, or misalignment." Id. Defendant Tate's diagnosis was that plaintiff had "bicep tendonitis possibly caused by heavy exercise given his muscular build," and, because he did not see any medical evidence to justify plaintiff's need for morphine and Gabapentin, he

discontinued them and so informed plaintiff. Id., Ex. A, 1-2 [# 47-1, 2 -3]. Defendant Tate also states that he informed plaintiff that he had abused the medical services request process and he issued a disciplinary report against plaintiff for seeking emergency treatment when his medications had not expired and after his appeal on the issue had previously been granted. Tate Dec., ¶ 8. Defendant Tate avers that he did not treat plaintiff after November 8, 2009 again, until May 2011. Id.

Medical records show that plaintiff was seen by another CCI medical provider on November 10, 2009, complaining that his pain medication had been discontinued by defendant Tate in retaliation for his submitting an emergency appeal. Tate Dec., ¶ 9. The medical staff member took note that plaintiff, despite a complaint of bilateral shoulder pain, was observed exercising, walking, and participating in daily activities without difficulty and that plaintiff had a normal gait and very muscular shoulders without signs of atrophy. Id., Ex. B, 2 [# 47-2, 3]. The practitioner saw no medical justification for morphine, but did renew Gabapentin for plaintiff and prescribed him Tylenol. Id. Plaintiff's medical records show that during November 2009, he went for two days without Gabapentin or pain medication. Tate Dec., ¶ 10, Ex. B, 6-11 [# 47-2, 7-12]. Medical records also show that plaintiff received Gabapentin every day during December of 2009, and was prescribed pain medication in the form of Tylenol and Motrin (Ibuprofen). Tate Dec., ¶ 11, Ex. B, 10-13 [# 47-2, 11-14].

Defendant Tate submits plaintiff's medical records showing that a Dr. Lee (a non-party) saw him on December 10, 2009, concerning plaintiff's inmate 602 appeal, according to Tate, filed against him (Tate) for discontinuing his medications on November 8, 2009. Tate Dec., ¶ 12, Ex. B, 3-5 [# 47-2, 4-7]. Defendant Tate observes that Dr. Lee noted that plaintiff was able to move his upper body freely, rotate his lumbar spine, flex and extend his legs, stand, and sit without any pain, difficulty, or any facial grimaces for pain. Id. Dr. Lee concluded further that plaintiff's pain complaint did not correlate with the medical findings, and he refused to renew plaintiff's request for morphine. Id. Although plaintiff stated that

1  Gabapentin did "nothing for [him]," Dr. Lee recommended that plaintiff stay on the medication
2  based on a March 2009 EMG showing that he had decreased sensation of the lumbar spine.  Id.
3  The court's review of the notes indicates that while Dr. Lee did "not see the Morphine Sulphate
4  [was] medically indicated based on CT and EMG, " he also wrote that should the MRI of
5  plaintiff sedated showed more significant problems, a referral to a specialist might be needed.
6  Docket # 47-1, p. 6.

7        In defendant Tate's review of the records, he declares that they show plaintiff
8  received pain medication in all of January 2010, prescribed by non-party Dr. Kang on January 13,
9  2010, in the form of Tylenol, Ibuprofen, and Tramadol; he received Gabapentin also in January
10 2010, except for a ten-day period when it was temporarily discontinued by Dr. Kang. Tate Dec., ¶
11 13, Ex. B, 13-15 [# 47-2, 14-16].  Plaintiff received Tramadol and Gabapentin three times a day
12 in February, March, May, June, July, and August 2010, according to the Medical Authorization
13 Records in plaintiff's file.  Tate Dec., ¶ 14, Ex. B, 14-36 [# 47-2, 15- 31, # 47-3, 1-5].   In April
14 2010, in defendant Tate's review, the records show Tramadol and Gabapentin were discontinued
15 for ten days, but plaintiff otherwise received these medications three times a day.  Tate Dec., ¶
16 15, Ex. B, 21-24 [# 47-2, 22-25].  Plaintiff received Gabapentin, per the records, three times a
17 day in September 2010, but a different doctor discontinued the Tramadol and prescribed him
18 another pain medication—acetaminophen with cod[e]ine. Tate Dec., ¶ 16, Ex. B, 37-42 [# 47-3,
19 7-12].  According to the medical records, plaintiff received Tramadol (which had been renewed
20 in late September by the same doctor who had discontinued it) and Gabapentin three times a day
21 with occasional lapses of a day or two (which defendant Tate characterizes as "minor") due to
22 changing or expiring prescriptions, from October 2010 to early May 2011; in March, 2011,
23 plaintiff was provided a prescription for Ibuprofen (800 mg tablets) to be taken three times daily.
24 Tate Dec. ¶ 17, Ex. B, 43-69 [# 47-3, 13-30]; see also, Ex. B, 61-71 [# 47-4, 1-11].

25       Defendant Tate then declares that he saw plaintiff on May 2, 2011, for his
26 complaints of back pain and examined his back, torso, and lower extremities, noting that his

build was still very muscular and that he did not appear to be in any distress during the examination.  Tate Dec., ¶ 18.  Defendant Tate asserts that he informed plaintiff that he was going to wean plaintiff off Gabapentin and Tramadol, ordering that he be weaned off these drugs over the period of a week and renewing his Ibuprofen prescription to address any pain complaints.  Id., Ex. A, 3-4 [# 47-1, 5-6].  On May 16, 2011, Dr. Tate saw plaintiff regarding an inmate appeal wherein he had complained that he had received neither pain nor blood-pressure medication "a few months before."  Tate Dec. ¶ 19, Ex. A, 6 [# 47-1, 7]   The court's review of defendant Tate's own progress notes for that day indicate that while plaintiff did not provide a specific date for when he had not received the medications, he identified the alleged omission as having occurred in March and April (or during the preceding two months).  Defendant's notes also set forth that at the time plaintiff filed the 602 on April 13, 2011, Tate's review of the MAR indicated that plaintiff had received all prescribed medications "at around that time."  Docket # 47-1, p. 7.

Defendant Tate also noted that plaintiff asked that he be provided Gabapentin and Tramadol again, but a review of plaintiff's medical records by the doctor did not reveal to him any medical necessity for these medications.  Tate Dec. ¶ 19, Ex. A, 6[6] [# 47-1, 7].  Defendant Tate maintains that plaintiff had "age appropriate degeneration of the spine and his muscular appearance and movements did not support his claim of pain."  Id.  Defendant Tate also avers that plaintiff still had a prescription for Ibuprofen which the doctor "believed was more than adequate to address any complaints of musculoskeletal pain he had."  Id.  The court's review of defendant Tate's progress notes for that visit states that plaintiff sought reinstatement of the pain medications "based on 'x-rays and MRI's not present in his current UHR...'" and he maintained that the Ibuprofen "'ain't doing nothing.'"  Id.

---

[6] Where the declaration cites pages that do not conform to pages of the exhibit identified the court has corrected the page number; the bracketed pagination identifies the location of the exhibit within the court's electronic pagination system.

When defendant Tate saw plaintiff on June 16, 2011, in response to plaintiff's emergency request for medical services, plaintiff complained that no doctor had seen him, he was in extreme pain, and he requested morphine, Tramadol, and Gabapentin. Tate Dec. ¶ 20, Ex. 7-8 [# 47-1, 8-9]. Defendant Tate found plaintiff upset and agitated from the outset of the visit; the doctor's examination was visual because of plaintiff's agitation and his insistence that Tate not treat him due to "a conflict of interest." Id. Defendant Tate noted that plaintiff walked and moved without difficulty or signs of pain. Id. The defendant's review of plaintiff's medical records indicated plaintiff had been seen by medical staff in response to his request for medical services, including plaintiff's visits to defendant Tate in the previous month when back exams showed plaintiff's back to be "within normal limits." Id. Defendant Tate also showed plaintiff a web page posted by plaintiff for a penpal, in which he "admitted" he is in good health and a weight trainer. Id. Exhibit C is a copy of the penpal advertisement defendant Tate downloaded from convicthouse.com. Id. Defendant states he reminded plaintiff that "labeling his request as an emergency or lying about the treatment he has received was an abuse of the medical process," after which plaintiff uttered profanities to the defendant and left. Id. Defendant asserts that following the June 16, 2011, visit, plaintiff "threatened" that should the doctor attempt to treat him again, "he would take it as a threat to his life and he would protect himself." Tate Dec., ¶ 21.[7] Defendant Tate's notes for plaintiff's visit that day indicate that he would be writing a 128-B informational chrono and a 115 Rules Violation Report against plaintiff "for disrespect." Docket # 47-1, 8.

Defendant maintains that since June of 2011, although plaintiff refused to attend medical appointments plaintiff had with him on July 21, July 28, August 11, August 18, August 22, and September 6, defendant rescheduled plaintiff for additional appointments "and made sure

---

[7] This aggressive, unusual thinking on the part of plaintiff could be perhaps a side effect of Gabapentin. See footnote 3. Again, this type of behavior might be a reason for not continuing Gabapentin.

his prescriptions, including pain medication, were renewed." Tate Dec. ¶ 22, Ex. A, 9-23; Ex. B, 78 [# 47-1, Ex. A, 10-24; # 47-4, Ex. B, 18].

Defendant observes that plaintiff's medical records demonstrate that other CCI medical staff have continued to monitor and treat plaintiff's conditions, including prescribing pain medication for him. Tate Dec. ¶ 23. Defendant Tate declares that the medical records available to him through mid-September of 2011, indicate that "no medical provider has determined that renewal of [plaintiff's] prescription for morphine, Tramadol, or Gabapentin is medically justified." Id. Defendant maintains that he has neither denied plaintiff medical treatment or pain medication and that on the basis of his review of the medical records, his examinations of him, and his observation of plaintiff's movements he does not see a medical justification for prescribing plaintiff with morphine, Tramadol, or Gabapentin, the only reason he discontinued their use. Tate Dec., ¶ 24.

Plaintiff further declares that plaintiff's Ibuprofen prescription for his pain, which he continues to receive, will not expire until November 17, 2011.[8] Tate Dec. ¶ 25, Ex. B, 78 [# 47-4, 18]. Defendant Tate maintains his treatment is based on medical evidence and records review, experience and training and is not retaliatory against plaintiff. Tate Dec. ¶ 26. He adds that he was not aware of the instant action filed against him until he was contacted by the Office of the Attorney General after issuance of this court's order, filed on September 19, 2011.

*Discussion*

The record shows that defendant Tate cut plaintiff off his morphine and Gabapentin in November of 2009, with no indication that the doctor tapered him off the medication. However, that is not the question for purposes of this motion. Although on November 10, 2009, a different medical provider found no medical justification for morphine, plaintiff's prescription for Gabapentin was reinstated. Dr. Lee later recommended in December

---

[8] The date for that prescription to expire as set forth in that exhibit is actually November 7, 2011.

1  2010 that plaintiff stay on the Gabapentin although apparently plaintiff said that it did nothing for
2  him.  Plaintiff was more or less regularly prescribed Tramadol and Gabapentin from January
3  2010 through part of September of 2010, when a doctor took plaintiff off Gabapentin and gave
4  him acetaminophen with codeine; the same doctor then reinstated the Gabapentin and from
5  October 2010 until May of 2011, when plaintiff was seen again by defendant Tate, he remained,
6  with minor lapses, on Tramadol and Gabapentin three times daily.  Plaintiff was provided a
7  prescription for Ibuprofen (800 mg tablets) in March of 2011.  In May of 2011, when plaintiff
8  saw defendant Tate again, plaintiff's Tramadol and Gabapentin was discontinued, although he
9  permitted continued use of Ibuprofen.  It does appear from this record that defendant Tate is the
10 most stringent when it comes to providing plaintiff with pain medication.

11         While it appears that other doctors did prescribe Gabapentin and Tramadol where
12 defendant Tate would not, it is also in the record that plaintiff has said that Gabapentin does
13 nothing for him.  Although Dr. Lee continued to recommend Gabapentin based on a prior test
14 showing plaintiff had decreased sensation of the lumbar spine, the same doctor found no medical
15 justification for morphine in late 2009.  Moreover, since May of 2011, apparently no physician
16 has found reinstatement of these medications a medical necessity for plaintiff.  No medical
17 assessment indicates that plaintiff is hampered or shows pain in his movements in any way nor
18 do the examinations he has undergone lead the medical experts to conclude that plaintiff needs
19 more than his current pain medication.  All evaluations indicate that he has a well-developed
20 musculature.  His own web posting proclaims his good health.

21         Although all medical practitioners would have some concern for the on-again-off-
22 again nature of plaintiff's drug prescriptions, plaintiff's *present*, injunctive relief dispute with
23 defendant Tate as to what pain medication he should be prescribed at this point amounts to a
24 mere difference of opinion concerning the appropriate treatment which cannot be the basis of an
25 Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330; Franklin v. Oregon, 662 F.2d
26 at 1344.  It is also insufficient to make the requisite showing of a likelihood of plaintiff's

suffering irreparable injury should a preliminary injunction not issue. Although it is yet to be determined whether there are "'serious questions going to the merits,'" there is not here demonstrated "a hardship balance that tips sharply toward the plaintiff." Alliance for Wild Rockies v. Cottrell, 632 F.3d at1132. The motion should be denied.

Accordingly, IT IS ORDERED that:

1. Although defendant Tate's court-ordered response in this case is an appearance and no further service has been ordered for him to be deemed served, he will not be required to file any response before the remaining defendants to be served are so required;

2. Plaintiff's motions for a court-ordered transfer of prisons, filed on September 26, 2011 (docket # 45), and on October 5, 2011 (docket # 49), pursuant to the Order, filed on June 24, 2011 (docket # 30), are disregarded.

IT IS HEREBY RECOMMENDED that plaintiff's motion for preliminary injunctive relief in the form of an order renewing his pain medication, filed on September 8, 2011 (docket # 41), be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 20, 2011

/s/ Gregory G. Hollows  
UNITED STATES MAGISTRATE JUDGE

GGH:009
solo2103.ofr